**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | Case No. 19 BK 34092 |
| ADETAYO ADEGOKE, | Chapter 13 |
| Debtor. | Judge: Hon. Jack B. Schmetterer |

**MEMORANDUM OPINION**

Debtor Adetayo Adegoke ("Debtor") has objected to Claim No. 2-3 of 3Cloud LLC ("3Cloud"). For the reasons stated herein, Debtor's Objection to Claim 2-3 [Dkt. No. 52] will be SUSTAINED IN PART and OVERRULED IN PART by separate order entered concurrently herewith.

**JURISDICTION**

Subject matter jurisdiction lies under 28 U.S.C. § 1334. The district court may refer bankruptcy proceedings to a bankruptcy judge under 28 U.S.C. § 157 and 28 U.S.C. § 1334, and this proceeding was thereby referred here by Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. Venue lies under 28 U.S.C. § 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). A bankruptcy judge has constitutional authority to enter final judgment as to claim objections. *In re Woodruff*, 600 B.R. 616, 621 (Bankr. N.D. Ill. 2019) (Barnes, T.).

**FINDINGS OF FACT[1]**

A. <u>3Cloud's Founding and Hiring of Debtor</u>

1. 3Cloud is a Delaware limited liability company, with its principal place of business located at 3025 Highland Parkway, Downers Grove, Illinois. 3Cloud was founded by former Microsoft executives and is a national consulting firm headquartered in Downers Grove, Illinois that helps businesses transition and maximize the Microsoft Azure cloud platform. [Joint Stipulation,[2] at ¶ 1].

2. Specifically, 3Cloud assists businesses in migrating their onsite datacenter assets, including infrastructure, data, and applications, to Microsoft-hosted cloud data centers (titled the Azure cloud), as well as digitally transforming those businesses through the development

---

[1] The Findings of Fact are drawn from the docket, the parties' stipulations of fact, and the testimony and evidence presented and admitted at trial.
[2] [Dkt. No. 137].

1

of new applications and processes that utilize the capabilities made available through the Microsoft Azure cloud platform. [Joint Stipulation, at ¶ 1; Trial Tr. Vol. I[3] 23:24-26:23].

3. Debtor is a former employee of 3Cloud. [Joint Stipulation, at ¶ 2].

4. Debtor was hired on October 21, 2016, as employee number two after the founders, Mike Rocco ("Rocco") and Jim Dietrich ("Dietrich"), in the position of Practice Director for Cloud Modernization, with an annual base salary of $175,000. Additionally, Debtor was guaranteed a first-year bonus of $35,000, payable in two installments of $17,500 each, on July 31, 2017 and January 31, 2018, with each installment payable if Debtor was still employed on the date of the scheduled payment. [Joint Stipulation, at ¶¶ 5-6, 8-9; 3Cloud Trial Ex. 1; Trial Tr. Vol I 28:15-29:5, 39:11-40:7].

5. In his position as Practice Director for Cloud Modernization, Debtor's responsibility was to build a practice that specifically focused on helping clients migrate from their on-premises data centers into Microsoft Azure. Specifically, it was his job to position and complete 3Cloud's cloud readiness assessments – essentially, providing technical and engineering guidance on the migration process by evaluating opportunities, conducting discovery, and recommending and implementing 3Cloud solutions to customers. [Trial Tr. Vol I 29:4-33:25].

6. Due to his responsibilities, Debtor was issued a company laptop computer, property of 3Cloud, with access to the entirety of 3Cloud's secure network and database, including confidential and proprietary processes and information. [Joint Stipulation, at ¶ 14; Trial Tr. Vol I 43:16-44:6].

7. At the outset of his employment, Debtor signed an employment agreement (the "Employment Agreement") and, as a condition of the same, also executed a confidential information and non-solicitation agreement (the "Restrictive Covenant Agreement"). [Joint Stipulation, at ¶¶ 5-7; 3Cloud Trial Ex. 1; Trial Tr. Vol. I 37:16-40:20].

8. Debtor remained employed with 3Cloud on July 31, 2017, and, in accordance with the Employment Agreement, 3Cloud paid Debtor the first guaranteed bonus installment of $17,500. [Joint Stipulation, at ¶ 10; Trial Tr. Vol. I 39:11-42:21].

---

[3] [Dkt. No. 170].

9. At some point in time towards the end of 2016, 3Cloud sent Debtor to Bellevue, Washington,[4] for training to become certified in Movere (a Microsoft-endorsed analysis tool that would help assemble Azure consumption costs estimates). [Joint Stipulation, at ¶ 11; Trial Tr. Vol. I 95:20-97:3, 149:21-153:15].

B.   Debtor's Demotion and Subsequent Actions Before Resigning

10. On August 2, 2017, Debtor was informed that going forward his role would be shifted from Practice Director to Principal Architect – a position more focused on delivery implementation of 3Cloud's migration projects. 3Cloud informed Debtor that the intention of this transition was for Debtor to have supervisory support and to obtain learning experience from a more senior individual. [Joint Stipulation, at ¶ 13; Trial Tr. Vol. I 97:4-99:21].

11. At the meeting, Debtor was visibly upset with this announcement and spoke in an elevated voice, but ultimately Debtor agreed to the change. [Trial Tr. Vol. I 97:4-99:21; Trial Tr. Vol. III 310:15-311:2].

12. Debtor's compensation remained the same despite the change in role. [Trial Tr. Vol. I 99:1-21].

13. Shortly thereafter, while still being employed by 3Cloud, Debtor began discussions with Concurrency, Inc. ("Concurrency") (another Microsoft partner firm – a competitor of 3Cloud), about overseeing their Azure cloud datacenter practice in Chicago. On August 31, 2017, Debtor conducted a phone interview with Concurrency and discussed a position at Concurrency for Debtor. [Joint Stipulation, at ¶¶ 19 & 21; 3Cloud Trial Ex. 59, at ¶ 10].

14. On September 7, 2017, Debtor had an on-site job interview at Concurrency. [3Cloud Trial Ex. 59, at ¶ 10; Trial Tr. Vol. III 328:22-329:20].

15. On September 8, 2017, Debtor accessed nearly four hundred confidential documents from 3Cloud's secure network (to which he had password protected access) and bulk file copied these documents from the network to his laptop. [Joint Stipulation, at ¶ 15; 3Cloud Trial Ex. 27; Trial Tr. Vol. III 305:15-327:20, 322:6-323:9, 328:19-21].

16. The files pulled on September 8, 2017 pertained to three clients of 3Cloud. [3Cloud Trial Ex. 27; Trial Tr. Vol. III 327:21-328:10].

---

[4] The joint stipulation lists Seattle, Washington, as the site of the training. Nonetheless, the exact location of the program is immaterial for purposes of this claim objection.

17. Debtor was not working on any of those three clients at the time. [Trial Tr. Vol. III 328:11-328:10].

18. The only client Debtor was working on in September of 2017 was Boston Consulting Group. [Trial Tr. Vol. I 111:11-20].

19. On September 11, 2017, Debtor emailed Concurrency discussing a position at Concurrency for Debtor. [3Cloud Trial Ex. 59, at ¶ 10].

20. On September 13, 2017, Debtor accessed fourteen files from 3Cloud's network relating to a new managed services business 3Cloud was creating at the time. The files accessed contained information on the pricing model, staffing support, and how the new business was being built. [Joint Stipulation, at ¶ 15; 3Cloud Trial Ex. 27; Trial Tr. Vol. III 329:21-331:4].

21. Debtor had no role in this managed services business. [Trial Tr. Vol. III 331:5-9].

22. On September 14, 2017, Debtor interviewed on-site at Concurrency with Concurrency CEO James Savage ("Savage"). [3Cloud Trial Ex. 59, at ¶ 10; Trial Tr. Vol. III 331:10-20].

23. On September 18, 2017, Debtor emailed Savage discussing a job position for Debtor at Concurrency. [3Cloud Trial Ex. 59, at ¶ 10].

24. On September 18, 2017, Debtor accessed sixty files from 3Cloud's network, which included, among others, highly confidential pricing tools, price structures, and proprietary documents of 3Cloud. [Joint Stipulation, at ¶ 15; 3Cloud Trial Ex. 27; Trial Tr. Vol. III 331:21-344:18].

25. In his delivery role with the only client he was handling, Boston Consulting Group, Debtor had no need for these documents. [Trial Tr. Vol. III 331:21-344:18].

26. On September 19, 2017, Debtor conducted an on-site job interview at Concurrency with Concurrency's operational leadership. [3Cloud Trial Ex. 59, at ¶ 10; Trial Tr. Vol. III 346:16-347:15].

27. On September 19, 2017, Debtor accessed an additional two files from 3Cloud's network. One of the two files accessed was a spreadsheet containing 3Cloud's 2017 pricing rate for services charged and discounting structure. The other file was, essentially, a blueprint of the migration project for one of 3Cloud's clients. [Joint Stipulation, at ¶ 15; Trial Tr. Vol. III 344:24-346:6].

28. Debtor was neither involved in this migration project nor was he working on this particular client. [Trial Tr. Vol. III 346:7-15].

29. Despite still being employed by 3Cloud, on October 6, 2017, Debtor signed an employment agreement with Concurrency to lead its competing Azure practice in Chicago starting October 23, 2017. [3Cloud Trial Exs. 13 & 59, at ¶ 10].

30. On October 8, 2017, Debtor called Rocco and notified him of his two-weeks' notice of his voluntary resignation from 3Cloud. When questioned where he was planning to go, Debtor stated he was going to work for another company but declined to provide the name of the new employer. [Joint Stipulation, at ¶ 16; Trial Tr. Vol. I 99:22-100:9].

31. On October 9, 2017, Debtor submitted his written notice of resignation to 3Cloud. [3Cloud Trial Ex. 15; Trial Tr. Vol. I 100:10-18].

32. On October 11, 2017, Debtor requested a company laptop from Concurrency, which he received on October 20, 2017. [3Cloud Trial Ex. 16 & 69, at 41-47].

33. Debtor's last day of employment with 3Cloud was October 20, 2017. [Joint Stipulation, at ¶ 17; 3Cloud Trial Ex. 15; Trial Tr. Vol. I 77:10-23].

34. Paragraph 2(e)(ii) of the Restrictive Covenant Agreement states:

> [Debtor] agrees that upon termination of his employment with [3Cloud], for any reason, [Debtor] shall return to [3Cloud], in good condition, all property of [3Cloud], including without limitation, the originals and all copies of any materials which contain, reflect, summarize, describe, analyze or refer or relate to any items of information listed in subparagraph 2(e)(i) of this [Restrictive Covenant Agreement]. In the event that such items are not so returned, [3Cloud] will have the right to charge [Debtor] for all reasonable damages, costs, attorneys' fees and other expenses incurred in searching for, taking, removing and/or recovering such property.

[3Cloud Trial Ex. 1, at 8].

35. On his last day, instead of coming into work, Debtor shipped his 3Cloud company laptop back to 3Cloud. [Joint Stipulation, at ¶ 18; Trial Tr. Vol. I 77:7-11].

36. Before shipping his 3Cloud computer back, Debtor wiped his computer, completely erasing and writing over the contents and history of the hard drive. [Trial Tr. Vol. I 79:14-80:18, 171:2-6; Trial. Tr. Vol. II 181:21-185:19].

37. In doing this, Debtor wiped out all files and all metadata on the laptop that would have allowed 3Cloud to see or recover Debtor's activities on the computer – including what

Debtor did with any copied files from 3Cloud's network on September 8, 13, 18, and 19 of 2017. [Trial. Tr. Vol. I 74:20-83:14; 149:2-149:15; Trial. Tr. Vol. III 380:17-383:7].

38. Debtor was neither instructed nor authorized by 3Cloud to do this. [Trial. Tr. Vol. I 75:2-13].

39. Debtor did not request permission to do so, nor did he inform 3Cloud he was intending to do so beforehand. [Trial. Tr. Vol. I 75:2-83:13; Trial. Tr. Vol. II 188:10-24, 190:4-10, 193:2-7].

C.  Debtor's Role at Concurrency and 3Cloud's Discovery of Debtor's Actions

40. On October 30 and 31 of 2017, Concurrency issued out press releases announcing the hiring of Debtor in the role of Vice President of the company's Customer Engagement and Cloud Datacenter practice areas. [Joint Stipulation, at ¶ 20; 3Cloud Trial Exs. 18 & 19].

41. Debtor's compensation at Concurrency included a base salary of $260,000, a signing bonus of $12,500, and other year-end or performance bonuses earned in 2018 and 2019. [3Cloud Trial Exs. 69, at 37-38].

42. In that role, Debtor was to lead and build Concurrency's competing Azure and cloud datacenter practice in Chicago. [3Cloud Trial Exs. 8 & 69, at 33; Trial Tr. Vol. I 54:9-19, 67:14-69:23, 101:7-102:2].

43. Specifically, Debtor's duties included overseeing cloud migration work that involved the Azure platform. [3Cloud Trial Exs. 13 & 69, at 21-27].

44. By November of 2017, 3Cloud learnt of Debtor's new role at Concurrency and began to examine Debtor's activities on 3Cloud's network server prior to his employment separation. [3Cloud Trial Exs. 23 & 24; Trial Tr. Vol. I 80:6-18; Vol. III 386:1-392:13].

45. Around this time, 3Cloud also discovered the fact that Debtor accessed and bulk copied hundreds of 3Cloud confidential files in rapid succession – files that were not related to any work Debtor was assigned to do for 3Cloud at the time. [3Cloud Trial Ex. 27; Trial Tr. Vol. III 305:15-346:15, 322:6-323:9].

46. On November 6, 2017, 3Cloud sent Debtor a letter advising him that 3Cloud had determined Debtor had accessed hundreds of 3Cloud's confidential and proprietary business files in September for no legitimate work reason and that his current employment appeared to be a blatant violation of his Restrictive Covenant Agreement. [Joint Stipulation, at ¶ 16; 3Cloud Trial Ex. 20].

47. On November 7, Debtor called Rocco and denied having accessed any 3Cloud documents improperly or for other than legitimate business reasons, and he further denied copying, or still having in his possession, any 3Cloud documents. [Joint Stipulation, at ¶ 23].

48. On the following day, Debtor sent a letter stating that he did not have any 3Cloud materials and asserted that he was aware of and would respect the terms and content of the Restrictive Covenant Agreement. [Joint Stipulation, at ¶ 24; 3Cloud Trial Ex. 21].

49. Despite Debtor's assertions, on November 11, 2017, through an audit, 3Cloud discovered that Debtor still maintained possession of 3Cloud files and information visible on Debtor's personal Microsoft OneDrive Account ("OneDrive") that continued to at least November 16 of 2017. [3Cloud Trial Exs. 23 & 24; Trial Tr. Vol. I 84:14-85:21, Trial Tr. Vol. III 305:15-311:22, 386:1-403:6].

50. On November 16, 2017, 3Cloud re-verified that 3Cloud files were still visible and available in Debtor's personal OneDrive account. [Trial Tr. Vol. III 402:23-403:6].

51. On November 16, 2017, 3Cloud, through counsel, sent a preservation letter to Debtor and Concurrency, attached with a screenshot dated November 11, 2017 of Debtor's OneDrive account. [Joint Stipulation, at ¶ 25; 3Cloud Trial Ex. 24].

52. In the preservation letter, 3Cloud advised of Debtor's Employment Agreement and Restrictive Covenant Agreement and demanded that Debtor and Concurrency acknowledge and abide by the terms of Debtor's continuing post-employment obligations to 3Cloud. [Joint Stipulation, at ¶ 26].

53. On November 23, 2017, 3Cloud attempted to re-visit Debtor's One-Drive account again, but all that was then visible was a notice that the files were no longer visible. [3Cloud Trial Ex. 26; Trial Tr. Vol. III 403:7-404:7].

54. Ultimately, from October 23, 2017 through April 17, 2019, Debtor worked as a Practice Director for Concurrency and earned, at Concurrency, $62,500 for the remainder of 2017, $285,936.28 in 2018, and $127,781.89 in 2019 until his departure date on April 17, 2019 (but was paid through May 15). [Joint Stipulation, at ¶ 28].

D. Subsequent Litigation and Present Bankruptcy

55. On January 4, 2018, 3Cloud filed suit against Debtor for misappropriation of trade secrets under the Defend Trade Secrets Act and the Illinois Trade Secrets Act, violation of the Computer Fraud and Abuse Act, breach of contract, breach of fiduciary duty, and for

spoliation of evidence, and against Concurrency for tortious interference with contract, in the United States District Court for the Northern District of Illinois (the "District Court Action").[56] [Joint Stipulation, at ¶ 29; District Court Action, Dkt No. 1].

56. On October 16, 2019, the District Court awarded sanctions to 3Cloud against Debtor, granting the portion of 3Cloud's motion to compel discovery regarding specific discovery request and an award of fees, and leaving the determination the amount of fees for further order. [Joint Stipulation, at ¶ 30; District Court Action, Dkt No. 110].

57. On November 21, 2019, 3Cloud submitted its fee application to the District Court. The District Court did not enter any subsequent order assessing the amount of fees. [Joint Stipulation, at ¶ 30; District Court Action, Dkt No. 118].

58. On December 3, 2019, Debtor filed the present chapter 13 petition. [Joint Stipulation, at ¶ 31; Dkt. No. 1].

## CONCLUSIONS OF LAW[7]

### A. Count I, III, and VII – Misappropriation of Trade Secrets and Spoliation of Evidence

3Cloud's first and third count is that Debtor is liable for his misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 *et seq.* and the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1 *et seq.* To prevail on a claim for misappropriation of a trade secret under the DTSA or ITSA,[8] a plaintiff must show that: (1) the information at issue was a trade secret; (2) that it was misappropriated; and (3) it was actually used in the defendant's business.[9] *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 721 (7th Cir. 2003).

---

[5] References to the District Court Action, Case No. 1:18-cv-00076, will be cited as [District Court Action, Dkt No. _].
[6] Cloud's tortious interference with contract claim against Concurrency (Count VI) was settled and dismissed on June 18, 2020. [District Court Action, Dkt No. 158].
[7] Findings contained in this "Conclusions of Law" section shall stand as additional findings of fact.
[8] The requirements for finding a violation under the statutes are identical. *Vendavo, Inc. v. Long,* 397 F. Supp. 3d 1115, 1129 (N.D. Ill. 2019).
[9] For the third requirement, quite some cases state, instead of actual use in defendant's business, the plaintiff must prove that the misappropriation caused harm to the plaintiff. *See Destiny Health, Inc. v. Connecticut Gen. Life Ins. Co.*, 2015 IL App (1st) 142530, ¶ 26, 39 N.E.3d 275, 282 (listing the third requirement as plaintiffs must prove the owner of the trade secret was damaged by the misappropriation); *Allied Waste Servs. of N.A., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1112 (N.D. Ill. 2016); *Liebert Corp. v. Mazur*, 357 Ill.App.3d 265, 293 Ill.Dec. 28, 827 N.E.2d 909, 925 (2005). Perhaps the implication is that both requirements are undistinguishable – that actual use inevitably causes harm to the trade secret's owner.

1.  3Cloud's Confidential Information Constitutes Protectable Trade Secrets

A trade secret may include any form or type of "financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes." 18 U.S.C. § 1839(3); *see also* 765 ILCS 1065/2(d) (defining a trade secret as "information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers").

Generally, to establish a protectable trade secret under either statute, the party seeking protection must show the information: "(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy and confidentiality." *Gen. Elec. Co. v. Uptake Techs., Inc.*, 394 F. Supp. 3d 815, 831 (N.D. Ill. 2019) (citing *PrimeSource Bldg Prods., Inc. v. Huttig Bldg. Prods., Inc.*, 2017 WL 7795125, at *13 (N.D. Ill. Dec. 9, 2017)). Under the first requirement, information does not qualify as a trade secret if it is "generally known or understood within an industry even if not to the public at large." *Pope v. Alberto-Culver Co.*, 296 Ill.App.3d 512, 230 Ill.Dec. 646, 694 N.E.2d 615, 617 (1998). And, under the second requirement, the owner must have taken "affirmative measures" to prevent others from using the information for it to qualify as a trade secret. *Jackson v. Hammer*, 274 Ill. App.3d 59, 210 Ill.Dec.614, 653 N.E.2d 809, 816 (1995).

Here, it is clear that the information and documents at issue unquestionably meet the first requirement. The information and documents to which Debtor had access to included, *inter alia*: (a) billing rates to clients; (b) billing rates to Microsoft; (c) sales pipeline files, which included names of targets, nature of opportunities as well as timing and anticipated dollar value of each opportunity; (d) detailed, confidential samples of client cloud readiness assessments and architectural blueprints for how to migrate the client's data and applications to the cloud – which are confidential deliverables of engagements that clients pay for and remain confidential as between 3Cloud and the client; (e) confidential operational template documents and agreements

9

prepared by legal counsel; and (f) proprietary budgeting and planning tools.[10] These documents and information clearly fall within the purview of the statutes' definition of trade secrets. *See* 18 U.S.C. § 1839(3) ("trade secret" defined to include "financial," "business," and "economic" information); 765 ILCS § 1065/2(d) ("trade secret" defined to include "financial data" and "list[s] of actual or potential customers or suppliers"); *see also Outsource International, Inc. v. George Barton & Barton Staffing Solutions*, 192 F.3d 662, 668 (7th Cir. 1999) (holding that cost and pricing figures, and comparable rates are protectable as trade secrets). Accordingly, 3Cloud has adequately demonstrated that the information at issue are sufficiently secret to derive economic value from not being generally known and available.

As to 3Cloud's efforts to keep the information secret, 3Cloud has identified the many measures it has implemented to safeguard the files. First, the confidential information is stored on a secured computer network, which 3Cloud employees access on password protected computers (and which those machines have encryption capability and may be remote wiped by 3Cloud management if a security concern exists).[11] Second, 3Cloud has security audit tools that document employees' actions to ensure the company's network remains secure.[12] Third, 3Cloud employees sign non-disclosure agreements and confidentiality agreements – similar to the Restrictive Covenant Agreement signed by Debtor in this case.[13] [3Cloud Trial Ex. 1]. Altogether, 3Cloud's efforts of keeping information confidential – electronic lock and key, limiting access, allowance of remote deletion, security logs and audit tools, and confidentiality agreements – satisfactorily demonstrate that 3Cloud has undertaken reasonable efforts to maintain secrecy and confidentiality. *See, e.g., Strata Mktg., Inc. v. Murphy*, 317 Ill. App. 3d 1054, 1069, 740 N.E.2d 1166, 1177 (2000) (concluding that company's many methods to maintain confidentiality of information were reasonable); *see also First Fin. Bank, N.A. v. Bauknecht*, 71 F. Supp. 3d 819, 843 (C.D. Ill. 2014) (requiring security codes to access computer systems and limiting access constitute reasonable steps to keep information confidential); *Liebert Corp. v. Mazur*, 357 Ill. App. 3d 265, 279, 827

---

[10] [3Cloud Trial Exs. 28, 29-37; Trial Tr. Vol. III 322:18-344:12, 336:3-21, 337:6-338:6, 355:21-357:7, 360:13-362:2, 365:16-366:1, 368:16-24, 376:1-10, 378:9-21].

[11] [Trial Tr. Vol. III 385:19-25].

[12] [Trial. Tr. Vol. III 305:24-310:2].

[13] Even information and deliverables that 3Cloud provides to clients are subject to non-disclosure agreements that preclude the client from sharing 3Cloud work product without 3Cloud's prior written consent. [3Cloud Trial Ex. 32, at 2].

N.E.2d 909, 923 (2005) (nondisclosure agreements are important evidence of reasonable steps taken to safeguard information).

In conclusion, 3Cloud has demonstrated that the information at issue is secret enough for value to be derived from not being disclosed and that reasonable efforts have been made to maintain its secrecy and confidentiality to qualify as protectable trade secrets.

2.  Debtor Misappropriated 3Cloud's Protectable Trade Secrets

A plaintiff may show actual trade secret misappropriation in several ways. 18 U.S.C. § 1839(5) (defining misappropriation under the DTSA); 765 ILCS 1065(b) (defining misappropriation under the ITSA). For example, one can misappropriate trade secrets by "acquiring" them through "improper means." 18 U.S.C. § 1839(5)(A), (6); 765 ILCS 1065(a), (b)(1). Misappropriation also occurs when one breaches a duty owed to protect the secrecy of the information. 765 ILCS 1065(b)(2)(B); 18 U.S.C. § 1839(5)(B). In short, misappropriation can be demonstrated by one of three ways: improper acquisition, unauthorized disclosure, and/or unauthorized use. *Destiny Health, Inc. v. Connecticut Gen. Life Ins. Co.*, 2015 IL App (1st) 142530, ¶ 28, 39 N.E.3d 275, 282 (2015).

Direct evidence is not required for a finding of misappropriation. Courts have "repeatedly recognized that plaintiffs in trade secret cases can rarely prove misappropriation by convincing direct evidence." *Lumenate Techs., LP v. Integrated Data Storage, LLC*, No. 13 C 3767, 2013 WL 5974731, at *5 (N.D. Ill. Nov. 11, 2013). Because direct evidence of theft and use of trade secrets is often unavailable, plaintiffs may prove misappropriation by the drawing of inferences from circumstantial evidence. *PepsiCo, Inc. v. Redmond*, No. 94 C 6838, 1996 WL 3965, at *15 (N.D. Ill. Jan. 2, 1996). "In most cases, plaintiffs . . . must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege did in fact take place." *Id.* Indeed, "circumstantial evidence is acceptable, indeed even expected, in trade secret misappropriation cases." *PolyOne Corp. v. Lu*, No. 14 CV 10369, 2018 WL 4679577, at *11 (N.D. Ill. Sept. 28, 2018).

Here, strong direct and circumstantial evidence exists that Debtor used improper means to acquire 3Cloud's trade secrets by downloading and copying the data for purposes other than serving his employer. On September 8, 2017, a day after Debtor attended an on-site job interview at Concurrency, a competitor of 3Cloud, within a span of approximately 41 minutes between 1

11

a.m. and 2 a.m., he accessed and downloaded 397 confidential files from 3Cloud's network to his laptop computer.[14] These files pertained to 3Cloud's largest three client cloud datacenter migrations at the time – clients that Debtor was not assigned to. Five days later, on September 13, 2017, the eve of Debtor's interview with Concurrency's CEO, Debtor accessed and downloaded all fourteen files related to 3Cloud's new managed services line of business that 3Cloud was creating at the time – a business that Debtor was not involved with. Then, on September 18, 2017, a day before Debtor's interview with Concurrency's leadership, Debtor accessed and downloaded sixty files, which included 3Cloud's highly confidential sales pipeline, rate cards, proprietary pricing tools, and operational template documents. Debtor was not working for the client related to these files, and had no need for the sales files since, given his reassignment, he was no longer working in a supporting sales role at 3Cloud.

Later, in October, Debtor signed an employment agreement with Concurrency and requested an early delivery of his new laptop computer from Concurrency so that he could "get it ready," all while he was still employed by 3Cloud and retained his 3Cloud laptop – which had access to 3Cloud's network. Then, afterwards, Debtor intentionally wiped his 3Cloud laptop's hard drive. By doing this, he destroyed all metadata that could be used to prove what Debtor did with the hundreds of confidential files accessed and copied in September of 2017, including if he printed, saved, or transferred them to another computer. Furthermore, in November of 2017, when 3Cloud discovered that Debtor was still in possession of certain files and notified Debtor of such – Debtor deleted the files from his OneDrive account while claiming he did not have access to those files. This was done despite Debtor having received two preservation notices.

Debtor disputes that he misappropriated any trade secrets. His arguments are twofold. First, he argues, while it is true that someone accessed the numerous 3Cloud files on the aforementioned dates, that there is no proof that it was Debtor himself. Instead, Debtor asserts that someone else could have accessed these files through his company account and that these files could have been "part of an automated company-wide update or scrub of data." [Dkt. No. 169, at 10]. And second, Debtor contends that there is no evidence of any transfer of information – that Debtor actually copied or transmitted any trade secrets to any other person or any other device.

---

[14] The auditing tool revealed that many large files were accessed within seconds (or fractions of a second) of each other – a pace not possible for an individual to manually open each file on the network. The implication is that for Debtor to access that number of files in such a short period of time, Debtor would have to be engaged in bulk copying.

12

The evidence does not support his assertions. Debtor never testified that someone else had access to his 3Cloud laptop or credentials for 3Cloud's secure network. Debtor did not testify that he did not access those files. Rather, his testimony at trial was that he could not recall which files he accessed. Specifically, he testified:

> Q: So [3Cloud Trial Ex. 27] is a list of all the files that you accessed on your computer through the 3Cloud network on August 8th, 13th, 18th and 19th. Are you saying that all of these file[s] were accessed as a result of you performing your job duties for the company?
> A: I don't know which files I accessed, how I accessed them or why I accessed them other than it would be in service of my job at 3Cloud.

Trial Tr. Vol. II 225: 12-25.

Without any evidence to the contrary, the logical conclusion is that Debtor was the only individual with access to his own credentials and was the individual who bulk copied hundreds of confidential files from 3Cloud's secure network on September 8, 13, 18, and 19, 2017 – all at a time when he admitted that he was in the midst of interviewing for a position leading a competing practice at Concurrency. The evidence suggests that Debtor took trade secrets for his own benefit (and/or for the benefit of his new employer) in landing and succeeding in his new employment with Concurrency to lead their competing cloud database practice.

And, despite his claims that any files he would have accessed would have been in support of his role he was performing at 3Cloud, Debtor did not rebut the fact that the files accessed and downloaded did not relate to the one client he was assigned to during the relevant time period. Furthermore, no evidence was presented by Debtor that an "automated company-wide update or scrub of data" occurred, nor, if so, that such an event would have also left Debtor's credentials in the auditing tool. Accordingly, without any proper explanation thereto, it is proper to hold that the evidence demonstrates that Debtor used improper means to access and take protectable trade secrets for his own purposes. *See Lumenate*, 2013 WL 5974731, at *5 (in determining whether a defendant misappropriated trade secrets, courts often "consider a defendant's suspicious downloading of company information before his departure and attempts to 'cover his tracks'"); *see also, e.g., RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 875 (N.D. Ill. 2001) (concluding that defendants' inability to explain the access of employer's computer system from home computer, to download and copy confidential information for non-work purposes days before resigning and joining competing company, was evidence of improper means).

As to Debtor's second argument, that no direct evidence exists that Debtor transferred any accessed or downloaded information to any other device or person, that is correct.[15] No such direct evidence exists – because Debtor destroyed any chance any could be obtained. But, as noted above, direct evidence is not required for a finding of misappropriation. And his spoilation of evidence allows for a negative inference – that he misappropriated trade secrets through unauthorized disclosure and/or unauthorized use and destroyed such evidence of misappropriation. *See 3M v. Pribyl*, 259 F.3d 587, 606 n. 5 (7th Cir. 2001) (a defendants' spoilation of evidence can support a negative inference from the act of destruction); *Liebert*, 357 Ill. App. 3d at 283, 827 N.E.2d at 927 ("We can infer from [defendant's] spoilation of the evidence on the laptop that he destroyed evidence of misappropriation . . . leading us to believe [defendant] acquired the price books through improper means.") (internal citations omitted); *Sys. Spray-Cooled, Inc. v. FCH Tech, LLC*, No. 1:16-CV-1085, 2017 WL 2124469, at *8 (W.D. Ark. May 16, 2017) (defendants' intentional destruction of hard drives to prevent plaintiff from inspecting them supports the conclusion that defendants destroyed evidence of misappropriation).

In response, Debtor argues that he did this because he "did not want to send the laptop through FedEx with any company data on it, in case it fell into the wrong hands." [Dkt. No. 169, at 3]. His argument is belied by his inconsistent testimony. While on trial he testified that he "wiped [the hard drive] to remove that risk from myself while having that data potentially go to someone else while in transit through FedEx," his testimony at deposition was that he couldn't remember exactly if he did wipe the hard drive or why he did so.[16] [Trial Tr. Vol. I 171:11-17; 3Cloud Trial Ex. 68 155:5-6, 155:18-157:10]. Debtor also did not provide any explanation, despite his apparent concern for information falling into the wrong hands, why he did not simply manually return his laptop to his employer – as was expected – or contact his employer for support to see if any security concerns would be an issue. As such, Debtor's explanation of why he wiped all data from the laptop (presented for the first time at trial and conflicting with his deposition testimony) is rejected as not credible. *See Liebert*, 357 Ill. App. 3d at 283, 827 N.E.2d at 927 (discounting defendant's stated reason for deleting company files as not credible); *see also, e.g., Mickey's Linen v. Fischer*, No. 17 C 2154, 2017 WL 3970593, at *12 (N.D. Ill. Sept. 8, 2017) (rejecting defendant's newly

---

[15] This argument, that no unauthorized use or unauthorized disclosure occurred, even if so correct, is also irrelevant since 3Cloud has adequately proven improper acquisition. Misappropriation only requires one way be shown, not all three. *See Liebert*, 357 Ill. App. at 281.
[16] Debtor was impeached on this point at trial.

stated reason for deleting company files as not believable after his first explanation was proven false).

Furthermore, Debtor destroyed additional evidence after receiving 3Cloud's November 16, 2017 legal preservation notice showing Debtor still in possession of confidential 3Cloud files on his personal OneDrive account weeks after moving to Concurrency. This deliberate action by Debtor fall squarely within the category of "bad faith" actions sufficient to support an adverse inference. *See, e.g., Krumwiede v. Brighton Assocs., L.L.C.*, No. 05 C 3003, 2006 WL 1308629, at *9 (N.D. Ill. May 8, 2006) (finding bad faith after party "continued to delete . . . files after being put on notice that the contents of the laptop computer were the subject of litigation.").

The Court concludes that 3Cloud is entitled to an adverse inference that the evidence Debtor destroyed and/or failed to preserve would have been relevant and harmful to Debtor. Furthermore, based on the substantial circumstantial evidence, the Court infers misappropriation – that Debtor improperly downloaded and/or transferred 3Cloud's trade secrets from his company laptop before he wiped the laptop's hard drive to delete all evidence of such transfers from that device.

3.   Debtor Used the Misappropriated Trade Secrets

A plaintiff must prove that the misappropriated trade secrets was used in the defendant's business. *Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1071 (N.D. Ill. 2020); *Abrasic 90 Inc. v. Weldcote Metals, Inc.*, 364 F. Supp. 3d 888, 896 (N.D. Ill. 2019); *Nat'l Tractor Parts Inc. v. Caterpillar Logistics Inc.*, 2020 IL App (2d) 181056, ¶ 40, *appeal denied*, 154 N.E.3d 787 (Ill. 2020).

3Cloud has made this demonstration. Everything Debtor knew about how to do a cloud datacenter migration using Azure he learned at 3Cloud. And, before leaving to lead a competing Azure practice group at Concurrency, Debtor copied hundreds of 3Cloud's confidential files about how to assess, plan, budget, and execute such work. As the vice president at Concurrency, Debtor led or consulted on projects that included numerous Chicago area clients, including clients that 3Cloud was pursuing before Debtor quit such as Komatsu.[17] After Debtor joined Concurrency, 3Cloud found out, despite having received a verbal indication by Komatsu to move forward with a cloud database migration project, that Concurrency was able to persuade Komatsu to not proceed and 3Cloud lost the Komatsu business opportunity. It can be properly inferred from the evidence

---

[17] [3Cloud Trial Exs. 40-41, 43, 47-51, 54, 69].

that Debtor used the misappropriated trade secrets to gain a competitive advantage and poach 3Cloud's business.[18] As such, 3Cloud has adequately demonstrated that Debtor used misappropriated trade secrets at Concurrency, causing harm to 3Cloud.

Thus, in sum, 3Cloud has met its burden of proof on its trade secrets claims under the ITSA and DTSA, having shown that it possesses protectable trade secrets, that Debtor improperly misappropriated its trade secrets, and that Debtor used those trade secrets in his business. However, as discussed in the damages section below, 3Cloud has not yet met its burden to prove damages.

## B.  Count II – Violation of the Computer Fraud and Abuse Act

3Cloud's second count is that Debtor is liable under the Computer Fraud and Abuse Act ("CFAA") for his unauthorized actions in accessing and copying 3Cloud's trade secrets for his own benefit. 3Cloud states claims against Debtor for violating sections 1030(a)(2)(C) and (a)(4). Under these sections, the CFAA prohibits "intentionally access[ing] a computer without authorization or exceed[ing] authorized access, . . . thereby obtain[ing] information from any protected computer," and "knowingly and with intent to defraud, access[ing] a protected computer without authorization, or exceed[ing] authorized access, and by means of such conduct further[ing] the intended fraud and obtain[ing] anything of value, unless the object of the fraud and thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period." 18 U.S.C. § 1030(a)(2)(C), (a)(4)(A)(i)(I).

While primarily a criminal statute, the CFAA provides a private right of action for any person who "suffers damage or loss by reason of a violation of this section . . . against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g); *Motorola, Inc. v. Lemko Corp.*, 609 F. Supp. 2d 760, 764 (N.D. Ill. 2009). "Thus, to recoup compensatory damages, a plaintiff must show *either* damage or loss." *U.S. Gypsum Co. v. Lafarge N. Am. Inc.*, 670 F. Supp. 2d 737, 743 (N.D. Ill. 2009) (emphasis in original). Under the CFAA, damage is defined as any "impairment to the integrity or availability of data, a program, a system or information." 18 U.S.C. § 1030(e)(8). And, loss means "either 'any reasonable cost to the victim, such as responding to the offense or otherwise restoring lost material' or 'lost revenue or other damages incurred as a result of interruption of service.'" *U.S. Gypsum*, 670 F. Supp. 2d at 743 (quoting *SKF USA, Inc. v. Bjerkness*, 636 F. Supp. 2d 696, 721 (N.D. Ill. 2009)). "Purely

---

[18] [3Cloud Tr. Exs. 40, 42, & 44; Trial Tr. Vol. I 117:9-118:12, 123:10-123:23, 124:14-20].

economic harm unrelated to the computer systems is not covered by this definition." *SKF USA*, 636 F. Supp. 2d at 721.

3Cloud's claims of economic harm related to the loss of the value of 3Cloud's trade secrets and 3Cloud's economic advantage in the market fail to meet the legal standard for damage under the CFAA. As noted by many courts, any loss of revenue due to the misappropriation of trade secrets, without more, does not meet the definition under the CFAA. *See SKF USA*, 636 F. Supp. 2d at 721 ("Although the lost revenues that [plaintiff] alleges were caused by [defendant's] unauthorized transfer of [plaintiff's] data might fit the usual understanding of the term 'loss,' the CFAA provides a different definition that trumps the ordinary definition."); *U.S. Gypsum*, 670 F.Supp.2d at 744 ("the CFAA is not intended to expansively apply to all cases where a trade secret has been misappropriated by use of a computer"); *Motorola*, 609 F.Supp.2d at 769 ("The only harm [plaintiff] has alleged is the disclosure to a competitor of its trade secrets and other confidential information. The CFAA's definition of damage does not cover such harm."); *Garelli Wong & Assocs., Inc. v. Nichols*, 551 F. Supp. 2d 704, 710 (N.D. Ill. 2008) ("Though [plaintiff] would like us to believe that recent amendments to the CFAA are intended to expand the use of the CFAA to cases where a trade secret has been misappropriated through the use of a computer, we do not believe that such conduct alone can show 'impairment to the integrity or availability of data, a program, a system, or information.'").

3Cloud's claims related to costs it incurred when Debtor wiped the laptop – such as the loss of any licenses or programs on the laptop or any forensic damage assessments – are addressable. *See, e.g., Patrick Patterson Custom Homes, Inc. v. Bach*, 586 F. Supp. 2d 1026, 1037 (N.D. Ill. 2008) (finding that costs of computer forensic experts hired to restore deleted files were compensable). The CFAA requires that the conduct at issue involve "1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)." 18 U.S.C. § 1030(g). Section 1030(c)(4)(A)(i)(I), relied upon by 3Cloud, requires a "loss to 1 or more persons during any 1–year period . . . aggregating at least $5,000 in value." But, because no evidence of relevant damages has been introduced, 3Cloud has not yet made this demonstration.

### C.  Count IV – Breach of Contract

3Cloud's fourth count is that Debtor breached his Employment Agreement and Restrictive Covenant Agreement with 3Cloud. To succeed on a claim for breach of contract, a plaintiff must show: (1) the existence of a valid, enforceable contract; (2) substantial performance by the

17

plaintiff; (3) breach of that contract by the conduct of the defendant; and (3) damages to plaintiff as a result of the breach. *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 786 (7th Cir. 2015) (citing *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 351 Ill.App.3d 752, 286 Ill.Dec. 734, 814 N.E.2d 960, 967 (2004)).

### 1.   The Restrictive Covenant Agreement is Valid

Prior to analyzing the reasonableness of a post-employment restrictive covenant, as a threshold question, courts must determine whether the restrictive covenant is accompanied by a valid contract such that the covenant was supported by consideration. *ExactLogix, Inc. v. JobProgress, LLC*, 508 F. Supp. 3d 254, 276 (N.D. Ill. 2020).

The Restrictive Covenant Agreement is ancillary to a valid contract – the Employment Agreement. *See Abel v. Fox*, 274 Ill. App. 3d 811, 813, 654 N.E.2d 591, 593 (1995) ("The covenant must be subordinate to the contract's main purpose."). None of the parties have disputed the validity of the Employment Agreement itself or the fact that the Restrictive Covenant Agreement is accompanied by a valid contract.

As to consideration, "[i]t is a basic tenet of contract law that in order for a promise to be enforceable against the promisor, the promisee must have given some consideration for the promise." *Vassilkovska v. Woodfield Nissan, Inc.*, 358 Ill. App. 3d 20, 26, 830 N.E.2d 619, 624 (2005) (citing *Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126, 1130 (7th Cir. 1997). Under the traditional rule, consideration is relatively easy to show, and courts do not inquire into the adequacy of consideration, only its existence. *Brown & Brown, Inc. v. Mudron*, 379 Ill. App. 3d 724, 728, 887 N.E.2d 437, 440 (2008).

For post-employment restrictive covenants, however, Illinois courts depart from the traditional rule and analyze adequacy. *Bankers Life & Cas. Co. v. Miller*, No. 14 CV 3165, 2015 WL 515965, at *3 (N.D. Ill. Feb. 6, 2015). This is so since continued employment could be an illusory benefit when employment is at-will. *Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 946 (7th Cir. 1994). And, if so, such "[a]n illusory promise is not adequate consideration." *Bankers*, 2015 WL 515965, at *3. "In Illinois, continued employment for a 'substantial period' is sufficient consideration to support an employment agreement." *Montel Aetnastak, Inc. v. Miessen*, 998 F. Supp. 2d 694, 715 (N.D. Ill. 2014). "This judicially devised requirement of a 'substantial period' of postcovenant employment avoids the need to investigate the employer's intentions; it does this by in effect creating an irrebuttable presumption that if the employee was fired shortly after he

18

signed the covenant the consideration for the covenant was illusory." *Curtis*, 24 F.3d at 946. As noted by the court in *LKQ Corp. v. Thrasher*:

> [T]his exception protects employees from employers who hire workers, have them sign post-employment restrictive covenants, then fire them soon thereafter. In this situation, an individual is not only harmed by his loss of employment, but also by the enforcement of a restrictive covenant which limits his ability to obtain new employment. Given this predicament, courts have been willing to depart from the traditional rule of refusing to evaluate the adequacy of consideration, and have examined whether consideration has been provided in the form of employment for a "substantial period."

785 F. Supp. 2d 737, 743 (N.D. Ill. 2011).

With this understanding of the substantial period requirement in mind, it is questionable if this exception is even applicable in this particular case. This case isn't one where an employer locked an at-will employee into a restrictive covenant and then fired that employee shortly thereafter. 3Cloud did not hire Debtor to lock him into the Restrictive Covenant Agreement and then found an excuse to fire him, leaving him unable to work for either 3Cloud or its competitor.

Rather, 3Cloud hired Debtor with a restrictive covenant tied to a bonus incentive due to the confidentiality and nature of the work he would be handling. 3Cloud even invested resources into training Debtor when 3Cloud realized Debtor did not have the qualifications necessary to fulfil his role. Later, when Debtor's performance still wasn't satisfactory, 3Cloud, instead of firing him and enforcing the restrictive covenant, transitioned Debtor into another role. Debtor's salary was not decreased, and 3Cloud still paid Debtor the first installment bonus of $17,500. Rather than being terminated, it was Debtor who ended his employment relationship with 3Cloud (and, in the process, misappropriated trade secrets). These critical facts, and the absence of any allegations or evidence suggesting that Debtor's resignation was involuntary, leads this Court to believe that the substantial period requirement is not applicable in this particular case.

Nonetheless, out of an abundance of caution, to the extent the substantial period requirement is applicable, and the adequacy of consideration ought to be evaluated, this Court will proceed with analyzing the sufficiency of the consideration received by Debtor from 3Cloud. In this case, the Employment Agreement states, in relevant part:

> Base Salary. The Company shall pay you for work performed on a salary basis in installments twice a month based on the Company's normal payroll practices as may be in effect from time to time. Your initial base salary will be $175,000 per year. Thereafter, the Company may review and make modifications to your salary from time to time . . .

[3Cloud Trial Ex. 1, at 2]. And the Restrictive Covenant Agreement states, in relevant part:

19

As described more fully in the Offer Letter dated October 21, 2016, as separate and additional consideration for the Employee's agreement to abide by the restrictions contained in this Agreement, the Company will guarantee the first-year bonus of $35,000 (to be paid semi-annually on July 31, 2017, and January 31, 2018) ("Fixed Bonus Payment"), provided Employee is employed as of the date of the first payment (July 31, 2017). In the event Employee is not employed on the date of the first payment (July 31, 2017), the Company may in its discretion choose to pay Employee $10,000 as separate and additional consideration, or choose to waive enforcement of this Agreement as part of a general release agreement signed by Employee.

[3Cloud Trial Ex. 1, at 5].

Debtor cites to a variety of cases for the implication that Debtor's (approximately) one year term of employment does not qualify as a substantial period of time. *See Fifield v. Premier Dealer Services, Inc.*, 2013 IL App (1st) 120327 (2013) (stating that a two-year contract term of employment is necessary to constitute adequate consideration); *In Cumulus Radio Corp. v. Olson,* 80 F. Supp. 3d 900 (C.D. Ill. 2015) (21 months of employment was substantial period of time); *Montel*, 998 F. Supp. 2d at 694 (15 months was sufficient).

Illinois law does not provide a clear answer. Some courts have applied what appears to be a bright-line rule defining what constitutes a substantial period of time. *See, e.g., Fifield*, 2013 IL App (1st) 120327, ¶ 19 ("Illinois courts have repeatedly held that there must be at least two years or more of continued employment to constitute adequate consideration in support of a restrictive covenant."). On the contrary, other courts have expressly rejected a bright-line rule defining a substantial period of time, instead considering other factors in determining whether sufficient consideration was provided, such as employee compensation and terms of the employee's termination. *See, e.g., Montel*, 998 F. Supp. 2d at 716 (citing cases); *Woodfield Grp., Inc. v. DeLisle*, 295 Ill. App. 3d 935, 943, 693 N.E.2d 464, 469 (1998) ("Factors other than the time period of the continued employment, such as whether the employee or the employer terminated employment, may need to be considered to properly review the issue of consideration."); *Bankers Life*, 2015 WL 515965, at *3. Because Illinois law does not provide a clear rule to apply, in absence of a ruling from the Illinois Supreme Court, this Court "must make a predictive judgment as to how the supreme court of the state would decide the matter if it were presented presently to that tribunal."[19] *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 635 (7th Cir. 2002).

---

[19] *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). "In the absence of guiding decisions by the state's highest court, [federal courts] consult and follow the decisions of intermediate [state] appellate courts unless there is a convincing reason to predict [that] the state's highest court would disagree." *ADT Sec. Servs., Inc. v. Lisle–Woodridge Fire Prot. Dist.*, 672 F.3d 492, 498 (7th Cir. 2012).

This Court also rejects the application of a bright-line test in favor of a more prudent fact-specific approach. *See LKQ*, 785 F. Supp. 2d at 744. Despite Debtor's arguments to the contrary, under the facts presented, it is held that the Restrictive Covenant Agreement is supported by adequate consideration.

The Restrictive Covenant Agreement was supported by continued employment for a "substantial period" of time. The promise of continued employment to Debtor was not an illusory benefit. Debtor worked at 3Cloud for approximately a year before resigning in October of 2017. The length of Debtor's employment, the efforts of 3Cloud to retain Debtor, and Debtor's voluntary resignation, leads to a conclusion that he was provided with a substantial period of employment. *See Mid–Town Petroleum, Inc. v. Gowen*, 243 Ill. App. 3d 63, 183 Ill. Dec. 573, 611 N.E.2d 1221, 1226 (1993) (citing approvingly to two cases involving a term of employment of approximately a year).

Additionally, the Restrictive Covenant Agreement was supported by a bonus. 3Cloud guaranteed Debtor a first-year bonus of $35,000 to be paid semi-annually on July 31, 2017 and January 31, 2018 as "as separate and additional consideration for the . . . restrictions in this [Restrictive Covenant] Agreement." [3Cloud Trial Ex. 1, at 5]. The fact that Debtor had to be employed on the requisite payment date does not change the fact that Debtor was paid. On July 31, 2017, Debtor was employed and subsequently paid the first guaranteed bonus of $17,500 as consideration for his restrictive covenants.[20] Debtor was not paid the second installment payment of $17,500 as he was not employed by January 31, 2018. Even if Debtor left early before July 31, 2017 (and therefore would have been ineligible for the first bonus payment), 3Cloud could have opted to pay Debtor the $10,000 as separate and additional consideration to enforce the Restrictive Covenant Agreement. Because Debtor received the first bonus payment on July 31, 2017, 3Cloud did not need to exercise its option to pay Debtor the $10,000 as consideration to support the restrictive covenants. Debtor's paid bonus sufficed as consideration. *See McRand, Inc. v. van Beelen*, 138 Ill. App. 3d 1045, 1055, 486 N.E.2d 1306, 1314 (1985) (consideration can take many forms, including bonuses and raises).

In conclusion, the Restrictive Covenant Agreement is valid as ancillary to a contract (the Employment Agreement) and is supported by adequate consideration.

---

[20] [Trial Tr. Vol. I 39:17-40:7].

2.   3Cloud Has Failed to Demonstrate that the Post-Employment Covenant is Enforceable

Post-employment restrictive covenants operate as partial restraints on trade and therefore are closely scrutinized by Illinois courts. *Cambridge Eng'g, Inc. v. Mercury Partners 90 BI, Inc.*, 378 Ill. App. 3d 437, 447, 879 N.E.2d 512, 522 (2007). Under Illinois law, a "post-employment restrictive covenant is generally held to be enforceable if it is reasonable in geographic and temporal scope and it is necessary to protect a legitimate business interest of the employer." *Brown & Brown*, 379 Ill. App. 3d at 728, 887 N.E.2d at 440. For restrictive covenants to be reasonable, the terms: (1) must not be greater than necessary to protect plaintiff; (2) must not be oppressive to the defendant; and (3) must not be harmful to the public. *Liautaud v. Liautaud*, 221 F.3d 981, 987 (7th Cir. 2000). The employer bears the burden of demonstrating that the full extent of the restraint is necessary for protecting its interests. *Health Pros., Ltd. v. Johnson*, 339 Ill. App. 3d 1021, 1034, 791 N.E.2d 1179, 1191 (2003).

Here, the Restrictive Covenant Agreement states:

For a period of twelve (12) months following the termination of Employee's employment with the Company, Employee will not:
    (A) enter into or engage in any business which competes with the Company's Business within the Restricted Territory;
    (B) solicit customers, business, patronage or orders for, or sell, any products and services in competition with, or for any business, wherever located, that competes with, the Company's Business within the Restricted Territory;
    (C) divert, entice or otherwise take away any customers, business, patronage or orders of the Company within the Restricted Territory, or attempt to do so; or
    (D) promote or assist, financially or otherwise, any person, firm, association, partnership, corporation or other entity engaged in any business which competes with the Company's Business within the Restricted Territory.

[3Cloud Trial Ex. 1, at 5]. And, "Restricted Territory" is defined as:

(i) the geographic area(s) within a one-hundred (100) mile radius of Chicago;
(ii) the State of Texas[;] and
(iii) all of the specific customer accounts, whether within or outside of the geographic area described in (i) or (ii) above, with which Employee had any contact or for which Employee had any responsibility (either direct or supervisory) at the time of termination of Employee's employment and at any time during the two (2) year period prior to such termination.

*Id.* at 9.

Debtor argues that the post-employment covenant is unenforceable for two reasons: (1) the restrictions are greater than necessary due to the lack of a reasonable limit on the geographical area; and (2) the restrictions are overly broad and oppressive, imposing undue hardship on the

Debtor's future employment. Specifically, in regard to the first argument, Debtor points out that subsection (ii) of the definition of "Restricted Territory" bars the second-largest state in the United States altogether (even though 3Cloud did not have any customers in Texas at the time of the signing of the Restrictive Covenant Agreement) and subsection (iii) of the definition of "Restricted Territory" effectively "throws out" all geographical restrictions.

In terms of assessing whether the territorial scope of the covenant is reasonable, courts generally look to whether the restricted area is comparable with the area in which the employer is doing business in. *Lawrence & Allen, Inc. v. Cambridge Hum. Res. Grp., Inc.*, 292 Ill. App. 3d 131, 139, 685 N.E.2d 434, 442 (1997). This is because "the employee should only be excluded from doing business in the territorial zone in which relationships with the employer's customers could have been established in ways that could be detrimental in the hands of a competitor. *Cambridge*, 378 Ill. App. 3d at 448, 879 N.E.2d at 523.

While subsections (ii) and (iii) may perhaps indeed be too expansive, the Court need not address the enforceability of those subsections as here 3Cloud is seeking only to enforce Debtor's restrictive covenants under subsection (i) – the 100 mile radius of Chicago, not 3Cloud's rights in Texas or elsewhere. [*See* Dkt. No. 179, at 10] ("3Cloud did not institute this suit to enforce its rights in Texas. 3Cloud only seeks to enforce Adegoke's restrictive covenants within a 100-mile radius of Chicago."). Furthermore, even if assumed true that subsections (ii) and (iii) are indeed too expansive, the offending provisions can be stricken from the Restrictive Covenant Agreement under the severability clause and the remainder of the Restrictive Covenant Agreement can be enforced. [*See* 3Cloud Trial. Ex. 1, at 9] (stating ". . . if any provision of this Agreement is held to be invalid or unenforceable in any respect under any applicable law, such invalidity or unenforceability shall not affect any other provision, but this Agreement shall be reformed, construed and enforced as if such invalid or unenforceable provision had never been contained herein."); *see also Kinkel v. Cingular Wireless, LLC*, 357 Ill. App. 3d 556, 569, 828 N.E.2d 812, 823 (2005), *aff'd*, 223 Ill. 2d 1, 857 N.E.2d 250 (2006) ("[a severability] provision indicates that the parties intended for the valid portions of the contract to remain in effect even in the absence of any unenforceable provisions.").

As to subsection (i), the restriction of a 100 mile radius of Chicago for twelve months, the Court cannot make a finding that this restriction is a reasonable restraint of trade. 3Cloud has not offered evidence demonstrating that the 100-mile geographical restriction is reasonable. The Court

23

was provided with no information by either side of relevant factors – such as the size of the industry and the number of competing companies that fall within the geographic limitations. 3Cloud has not demonstrated why a 100 mile radius is necessary to not injure 3Cloud or any proof that 3Cloud was doing business close to a 100 mile radius of Chicago. *See Liautaud*, 221 F.3d at 988 ("Generally, courts will uphold a restriction on competition that is coextensive with the area where the promisee is doing business."). No testimony was provided explaining the logic or necessity of the geographical limitation.

Additionally, no evidence was introduced showing that the temporal limitation was reasonably related to the needs of 3Cloud. *See id.* ("The length of time for the restriction must be reasonably related to the needs of the promisee's business."). In *Midwest Television, Inc. v. Oloffson*, the Illinois Appellate Court affirmed the trial court's holding that the 12-month time restriction was reasonable in light of the evidence demonstrating that a new advertiser's business can take much longer than a year to develop based on the substantial time and effort needed to attract listeners and advertisers. 298 Ill. App. 3d 548, 557, 699 N.E.2d 230, 235 (1998). In the present case, the record contains no evidence regarding how long it took 3Cloud to acquire a client or obtain the contract on a project. Therefore, no finding can be made on the reasonableness of the one-year time restriction in this case. Accordingly, 3Cloud has failed to show that these specific restrictions were reasonably necessary for the protection of its business.

While indeed it is well established that a court may modify a restrictive covenant that is overly broad to make it narrower, especially where a restrictive covenant contains a severability clause, *see Brown & Brown, Inc. v. Ali*, 592 F. Supp. 2d 1009, 1046 (N.D. Ill. 2009), it is not up to the courts to make up evidence. While in some cases the courts can rewrite the terms of a parties' agreement, it cannot be done unless the parties provide evidence for the basis of such redrafting. Here, the record reflects that no such evidence was provided. As such, the Court declines to modify the scope of the restrictive covenant.

Therefore, because 3Cloud has not shown that the terms of the post-employment covenant are not greater than necessary to protect itself, the Court need not decide whether the terms are oppressive to Debtor or harmful to the public. Accordingly, as no demonstration has been made that the post-employment restrictive covenant is reasonable, the post-employment covenant is unenforceable. However, due to the severability clause, the post-employment covenant can be stricken while the remainder of the Restrictive Covenant Agreement can be enforced.

3. <u>Debtor Breached the Restrictive Covenant Agreement by Wiping the Hard Drive of the Laptop</u>

As noted above, the Restrictive Covenant Agreement is valid. Debtor has not disputed the validity of the remainder of the Restrictive Covenant Agreement,[21] including subsection 2(e)(ii), which states:

> Employee agrees that upon termination of his employment with the Company, for any reasons, Employee shall return to the Company, in good condition, all property of the Company, including without limitation, the originals and all copies of any materials which contain, reflect, summarize, describe, analyze or refer or relate to any items of information listed in subparagraph 2(e)(i) of this Agreement. In the event that such items are not so returned, the Company will have the right to charge Employee for all reasonable damages, costs, attorneys' fees and other expenses incurred in searching for, taking, removing and/or recovering such property.

[3Cloud Trial Ex. 1, at 7].

There is no dispute that 3Cloud substantially performed under the Employment Agreement and the Restrictive Covenant Agreement. When Debtor wiped his 3Cloud laptop hard drive clean, he breached the above referenced subsection, which required him to return to 3Cloud, in good condition, his company issued laptop. Debtor did not do so. Instead, Debtor deliberately destroyed 3Cloud's information on the laptop by wiping the hard drive to cover his tracks. 3Cloud never authorized Debtor to wipe the hard drive clean, and Debtor never asked nor provided any notice of his intention to do so. Because of Debtor's actions, 3Cloud suffered damages including the costs of restoration of the laptop as well as any loss of licenses and programs on the laptop. In conclusion, it is held that Debtor breached the Restrictive Covenant Agreement. However, 3Cloud has not yet proved its damages for such breach.

**D. Count V – Breach of Fiduciary Duty**

To prove a breach of fiduciary duty, a plaintiff must prove: (1) the existence of a fiduciary duty; (2) the breach of that fiduciary duty; and (3) such breach proximately caused the injury of which the plaintiff complains. *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 709 (7th Cir. 2010).

"State law causes of action that are based upon the misappropriation of confidential business information are preempted by ITSA . . . even when the information does not rise to the level of a trade secret." *Abrasic*, 364 F. Supp. 3d at 905; *see also Spitz v. Proven Winners N. Am.,*

---

[21] His sole argument, apart from that the post-employment restrictive covenant is unenforceable, is that the Restrictive Covenant Agreement is invalid due to lack of consideration. However, as explained above, the Restrictive Covenant Agreement is valid.

*LLC*, 759 F.3d 724, 733 (7th Cir. 2014) (stating that the "preemptive language in the ITSA [has been read] to cover claims that are essentially claims of trade secret misappropriation, even when the alleged 'trade secret' does not fall within the Act's definition").

While state law theories of liability premised on conduct *other* than the misappropriation of confidential business information are not preempted, here, 3Cloud's claim is that Debtor "owed a fiduciary duty to 3Cloud [and] he intentionally breached that fiduciary duty by misappropriating 3Cloud confidential and proprietary information, and but for [Debtor's] breach 3Cloud would not have been harmed." [Dkt. No. 162, at 42]. 3Cloud has not proven that its breach of fiduciary duty claim is based on more than the misappropriation of confidential information. Therefore, 3Cloud's claim for breach of fiduciary duty is preempted by the ITSA and judgment will be entered for Debtor on this count.

### E. Damages

#### 1. Damages Under the ITSA and DTSA (Count I and III)

A prevailing plaintiff is entitled to recover damages for misappropriation under the ITSA and the DTSA. 765 ILCS 1065/4; 18 U.S.C. § 1836(b)(3). Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by the misappropriation that is not taken into account when computing for actual loss. *Id.* Additionally, in lieu of the aforementioned methods, the court may award damages caused by misappropriation measured in terms of a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret." *Id.* Furthermore, both acts provide for exemplary damages in an amount not exceeding twice any award made if "willful and malicious misappropriation" exists. *Id.* "Willful and malicious misappropriation" includes intentional misappropriation as well as a misappropriation resulting from the conscious disregard of the rights of another. *Learning Curve*, 342 F.3d at 730.

3Cloud has not yet provided evidence of actual damages or unjust enrichment caused by the misappropriation. As such, damages may also be awarded measured in terms of a reasonable royalty – and may be doubled for Debtor's willful and malicious misappropriation. However, no information was provided to the Court of what a reasonable royalty would be. In *RKI, Inc.*, the court found that $100,000 represented a reasonable royalty based on plaintiff's trade secrets which had a value in the millions of dollars in light of the long history and cost required to obtain the information. 177 F. Supp. 2d at 880. Here, the parties have not provided any evidence of the value of 3Cloud's trade secrets. While 3Cloud's trade secrets undoubtedly have value of some sort,

26

without evidence, the Court will not arbitrarily select an amount. To recover damages, 3Cloud must provide evidence of such sort. 3Cloud has not yet made this demonstration.

Additionally, under both the ITSA and the DTSA, attorney fees may be awarded to the prevailing party if "willful and malicious misappropriation" exists. 765 ILCS 1065/5; 18 U.S.C. § 1836(b)(3). Here, based on Debtor's willful and malicious appropriation, the Court will award reasonable attorney fees to 3Cloud.

2.  Damages under the CFAA (Count II)

3Cloud has not yet demonstrated the jurisdictional amount of loss required – no evidence was introduced that such loss exceeded $5,000 within one year. To the extent 3Cloud is implying that the legal costs it has incurred meet this threshold, 3Cloud has not met its burden. 3Cloud has not demonstrated that any of the legal fees result from responding to the offense or conducting a damage assessment. In contrast, legal fees associated with litigation are too attenuated to qualify as CFAA loss. *ExactLogix,* 508 F. Supp. 3d at 268. While Debtor's conduct itself may be addressed by the CFAA, 3Cloud nevertheless is required to show that it suffered a harm recognized by the statute. 3Cloud has not yet made this demonstration.

3.  Damages for Breach of Contract

3Cloud is also entitled to attorney fees and costs for Debtor's breach of contract. Pursuant to the Restrictive Covenant Agreement, 3Cloud is entitled to "reasonable damages, costs, attorneys' fees and other expenses incurred in searching for, taking, removing and/or recovering such property" relating to Debtor's willful wiping of 3Cloud's laptop. [3Cloud Trial Ex. 1, at 7].

The party claiming damages for breach of contract bears the burden of proof of proving damages to a reasonable degree of certainty. *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 632 (7th Cir. 2007) (citing Illinois law). "[W]hen a party establishes that it is entitled to damages but fails to prove the amount of those damages to a reasonable degree of certainty, only nominal damages are recoverable at the discretion of the trial judge."). *Id.*

3Cloud has not yet presented evidence demonstrating its damages suffered due to Debtor's breach of contract. Should it fail to prove so to a reasonable degree of certainty, 3Cloud is only entitled to nominal damages (and attorney fees and costs).

**CONCLUSION**

For the aforementioned reasons, the Court finds in favor of 3Cloud on Count I, III, IV, and VII, with the issue of damages being reserved for future hearing. Should 3Cloud adequately

demonstrate the jurisdictional threshold required under the CFAA, judgment will then be entered in favor of 3Cloud on Count II. Count V is found in favor of Debtor.

3Cloud's allowed claim is therefore determined as follows: (i) any proven damages for the misappropriation under Count I and III; (ii) any proven loss recognized by the CFAA; (iii) any proven damages (or nominal damages) under Count IV; and (iv) reasonable attorney fees and costs. Debtor's Claim Objection will be SUSTAINED IN PART and OVERRULED IN PART and the matter will be set for further hearing on the issue of damages by separate order entered concurrently herewith.

ENTER:

_____
Jack B. Schmetterer
United States Bankruptcy Judge

Dated this 20th day of August 2021